An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 25-180

Filed 15 October 2025

Forsyth County, Nos. 24JA000005-330, 24JA000006-330

IN THE MATTER OF: P.S.C. & P.S.C.

Appeal by Respondent-father and Respondent-mother from orders entered 19 August 2024 and 4 October 2024 by Judge David E. Sipprell, in Forsyth County District Court. Heard in the Court of Appeals 24 September 2025.

*Assistant County Attorney Melissa Catherine Starr Livesay, for Forsyth County Department of Social Services, Petitioner-Appellee.*

*NC GAL Staff Attorney Matthew D. Wunsche for the Guardian ad Litem.*

*BJK Legal, by Benjamin J. Kull, for Respondent-Appellant Father.*

*Robinson & Lawing, LLP, by Christopher M. Watford, for Respondent-Appellant Mother.*

WOOD, Judge.

Respondent-father ("Father") and Respondent-mother ("Mother") appeal the trial court's 19 August 2024 adjudication order adjudicating P.S.C. ("Paul") abused

and neglected and P.S.C. ("Patrick") as neglected and the 4 October 2024 dispositional order from the same hearing.[1] After careful review, we affirm the trial court's orders.

## I. Factual and Procedural Background

On 29 December 2023, Davidson County Department of Social Services ("DCDSS") received an initial Child Protective Services ("CPS") report alleging Paul, two-months old, and Patrick, seventeen-months old, were abused and neglected. On 29 December, Father brought Paul to the Brenner Children's Hospital emergency department. He reportedly told staff that Paul had been "crying uncontrollably" for two weeks and reported seeing swelling in his face that day. He also noted Paul had a "hemorrhage in his eye" for the past two days. He called Mother during intake who reported noticing swelling and that Paul's face was "stiff." She also noted that Patrick had scratched Paul's eye earlier that day. Paul was admitted to the Children's Hospital, and an abuse protocol was initiated.

Paul's medical records from the hospital reflect the following injuries: an acute 4mm anterior left temporal convexity subdural hematoma, moderate volume scattered acute subarachnoid hemorrhage, mildly depressed right parietal calvarial fracture with overlying subgaleal hematoma, possible benign enlargement of the subarachnoid spaces of infancy or chronic subdural hygromas, and subconjunctival hemorrhage in the left eye.

---

[1] Pseudonyms are used to protect the identity of the juveniles pursuant to N.C. R. App. P. 42(b).

Following the medical evaluation, DCDSS questioned Mother and Father about the events leading to Paul's injury and possible causes. Father stated that Mother had gone out with a friend. He was watching the children but went to the bathroom for seven to eight minutes, and when he returned, he noticed Paul's breathing was slow and shallow. He texted Mother regarding his concerns about Paul as well as a video of Paul being nonresponsive. He told her he thought Paul should go to the hospital. Mother responded, asking about Paul, but did not return home for nearly an hour, at which time she asked a stranger to take Paul and Father to the hospital while she stayed with Patrick. The parents told DCDSS about an incident in which Mother fell while holding Paul because of medical issues which cause dizziness; however, she denied that Paul hit the floor. Additionally, the parents suggested that Patrick may have hit Paul with a plastic piano toy. Because none of parents' explanations were plausible based on the severity of the injuries, medical providers determined that the various traumatic head injuries were indicative of child physical abuse.

DCDSS responded to the report because parents gave the hospital an address in Davidson County. DCDSS visited the address provided but no one was home. DCDSS then contacted Mother by phone. Mother reported that the address was the children's paternal grandfather's home, so she texted an alternate address to DCDSS. DCDSS went to the address provided to interview Mother and to ascertain the safety of Patrick. Once the social worker arrived, Mother continuously changed her story

with DCDSS, attempting to keep Patrick away from them. DCDSS estimated that it took sixteen hours to complete the initial interview and social workers from multiple counties were utilized to locate Patrick due to Mother's continuous deception. As Mother's story changed, it raised questions about whether the investigation should be conducted by Davidson, Wake, Guilford, or Forsyth County. DCDSS eventually determined that at the time of the incident the family was living in Forsyth County. However, prior to transitioning the case to Forsyth County Department of Social Services ("FCDSS") on 4 January 2024, DCDSS created a safety plan in which, among other conditions, Patrick was to stay in a parent chosen safety placement with Mother's great aunt Artesia and contact with Paul at the hospital was limited to verbal updates from hospital staff.

On 4 January 2024, FCDSS received a complaint from the parents alleging they previously had seen Artesia's eight-year-old daughter waving a gun around the home and had observed marijuana buds on a windowsill at her home. Parents raised concerns that the placement was not safe. Social workers questioned why parents recommended the placement when they were aware of such safety issues.

On 5 January 2024 Mother completed a clinical assessment at Daymark Recovery Services. Mother reported suffering from post-partum depression, including intrusive thoughts about putting her children in the dryer or the oven as well as suicidal ideations, alcoholism, and drug use. However, in later testimony

during the adjudication hearing Mother stated the vast majority of the information she gave Daymark personnel were lies meant to manipulate DCDSS.

On 8 January 2024, Winston-Salem police responded to multiple 911 calls to the parents' residence. The first call occurred at approximately 2:00 a.m. for a reported disturbance with weapons. Based on the officer's report, Mother and Father answered the door nude and advised officers that everything was fine. Mother appeared to be holding a laptop "as if she and [Father] were making a pornographic film." No crimes were reported by either party. Police responded to the second call to the residence at 3:00 a.m. Father was clothed and standing outside. He reported that he was having "relationship issues" with Mother who had left. Police requested permission to check the house to ensure safety. Police noted a stripper pole in the middle of the living room and a dildo on the floor. No one was present inside the residence.

Mother called 911 again at 5:15 a.m. She reported leaving the residence because Father had attempted to rape her and threatened to kill himself when she refused to come home. She had not heard from Father for a few hours after the threat and was concerned he may have hurt himself. When police responded to the home, Father answered the door and denied telling Mother he would hurt himself. Mother initially stated to police that she did not want to press charges for the attempted rape, then called back later to describe the incident and pursue charges but ultimately changed her mind again. Charges were never filed.

Mother returned home at approximately 6:30 a.m. Upon her entrance, Father called police to report a break-in. The police responded and informed Father that they could not make Mother leave the home. Father told officers he would cut his throat with a knife, making a motion towards the kitchen knives. Consequently, Father was taken into custody for an emergency involuntary commitment.

On 9 January 2024, FCDSS filed juvenile petitions alleging Paul and Patrick were abused and neglected. The petition outlined Paul's injuries including the skull fracture, brain bleeds and blood in his eye and parents' inability to adequately explain those injuries as well as concerns with parents' mental health and stability as parents have noted issues with post-partum depression and homelessness during their interviews with social workers. Additionally, text messages between the parents obtained from law enforcement were included in the petition. In the text messages the parents discussed lying to DSS and working together to "jugg" or hustle DSS saying "[w]e will blame all that on me having PPD and I'll get help" and "I wish we knew someone who would lie and say they'll take [Patrick] and then give him to us." A pre-adjudication hearing was scheduled for 14 February 2024.

FCDSS filed a Motion to Amend the Juvenile Petition prior to the pre-adjudication hearing on 14 February 2024 to add additional information about the events of 8 January 2024. The trial court ordered that the children remain in the nonsecure custody of FCDSS, required the parties to exchange all pre-hearing

materials and depositions by 1 April 2024, and scheduled the adjudication hearing for 6 May 2024.

On 5 May 2024, Mother advised the trial court that she had obtained a medical expert, notwithstanding the trial court's order that the parties exchange all pre-hearing information by 1 April 2024. Neither FCDSS nor their expert were noticed or given time to respond. Additionally, Father's attorney advised the trial court that she was closing her practice and would be unavailable to appear in matters in Forsyth County Juvenile Court after 1 July 2024. The trial court continued the adjudication until 8 July 2024 and appointed new counsel for Father.

The adjudication hearing was conducted over the course of several days, 8 July, 10 July, 22 July, and 19 August 2024. The trial court heard evidence from FCDSS, DCDSS, Winston-Salem police, Mother, Father, a medical expert proffered by FCDSS, and a medical expert proffered by Mother. The trial court issued an order on 19 August 2024 with 146 findings of fact and concluded that Paul was an abused and neglected juvenile and Patrick was a neglected juvenile. The trial court found that FCDSS failed to prove that Patrick was abused under N.C. Gen. Stat. § 7B-101(1).

The trial court then moved into the disposition hearing. The FCDSS social worker, guardian ad litem, and Mother testified. The social worker provided significant information regarding Paul's health since the initial incident. Paul was hospitalized for fifty-four days. Initially, he was released to the foster parent's care;

however, the foster parents noted possible seizure activity and returned him to the emergency room. A buildup of fluid around his brain required the drilling of burr holes through his skull on each side of the brain to allow drainage. Infection is a common side effect of burr holes, and Paul contracted meningitis, causing additional fluid buildup, fever, and other infection related symptoms. Two more burr holes were drilled to release the additional fluid. Eventually, Paul recovered and was discharged from the hospital. The social worker testified he is currently receiving physical and occupational therapies to target deficits caused by his injuries and for developmental delays. The social worker also testified that Patrick was being evaluated for possible speech and language delays.

The social worker noted it was difficult for FCDSS to determine if Mother and Father were "together" in any manner. Mother had previously requested separate visitation times from Father because she reported she had concerns about Father after receiving the hospital report on Paul. However, at times, Mother and Father would arrive at visitation sessions together even when only one of them was visiting and sent joint voice or text messages to the social worker. When the social worker asked about their relationship, parents reported that they were no longer in a relationship. Additionally, it was difficult for FCDSS to engage with parents in assessments because their responses and stories changed regularly and they gave misinformation and made misleading statements. FCDSS recommended ceasing reunification efforts.

Mother testified she was currently living with Father again, but they were not currently in a relationship. She further testified that she is pregnant and waiting for a bed at a maternity shelter. She reported that Father is not the biological father of the new baby. Although the trial court had requested Mother provide a full or consistent picture of her mental health evaluations or treatments during the disposition, Mother failed to provide any assessments or documents to support her testimony.

The children's guardian ad litem testified that the boys are thriving in their foster care placements. She stated Mother and Father struggled during visitation to balance the needs of both children. Father is more independent and effective than Mother, but both would benefit from a parenting coach. Additionally, she testified Patrick has been experiencing night terrors for approximately three months. Foster parents reported to her that they occur on Tuesdays and Thursdays after visitation, predominately after visits with Mother.

The trial court issued a disposition order on 4 October 2024 finding that it was in the best interest of the children to remain in the custody of FCDSS, aggravating circumstances existed under N.C. Gen. Stat. § 7B-901(c)(1), and reunification efforts would not be required. The trial court ordered two-hour bi-weekly supervised visitation with the parents and scheduled a permanency planning hearing.

Father filed notice of appeal on 24 October 2024, and Mother filed notice of appeal on 13 November 2024.

## II.    Analysis

On appeal, Father and Mother argue the trial court abused its discretion when it relieved FCDSS from making reunification efforts with the parents because its findings and conclusions did not support the existence of aggravating circumstances under N.C. Gen. Stat. § 7B-901(c)(1)(f).  We disagree.

"The district court's assessment of a juvenile's best interest at the dispositional stage is reviewed only for abuse of discretion." *In re A.R.A.*, 373 N.C. 190, 199, 835 S.E.2d 417, 423 (2019) (cleaned up).  "Only a finding that the judgment was unsupported by reason and could not have been a result of competent inquiry, or a finding that the trial judge failed to comply with the statute, will establish an abuse of discretion."  *Klein v. Klein*, 290 N.C. App. 570, 578, 892 S.E.2d 894, 903 (2023) (quoting *Wiencek-Adams v. Adams*, 331 N.C. 688, 691, 417 S.E.2d 449, 451 (1992)).  This abuse of discretion standard holds true for a trial court's dispositional decision to eliminate reunification.  *In re L.N.H*, 382 N.C. 536, 546, 879 S.E.2d 138, 146 (2022).

During a dispositional hearing, the trial court is required to comply with N.C. Gen. Stat. § 7B-901(c) which reads in pertinent part:

> (c) If the disposition order places a juvenile in the custody of a county department of social services, the court shall direct that reasonable efforts for reunification as defined in G.S. 7B-101 shall not be required if the court makes written findings of fact pertaining to any of the following, unless the court concludes that there is compelling evidence warranting continued reunification efforts:

(1) A court of competent jurisdiction determines or has determined that aggravated circumstances exist because the parent has committed or encouraged the commission of, or allowed the continuation of, any of the following upon the juvenile:

a. Sexual abuse.
b. Chronic physical or emotional abuse.
c. Torture.
d. Abandonment.
e. Chronic or toxic exposure to alcohol or controlled substances that causes impairment of or addiction in the juvenile.
*f. Any other act, practice, or conduct that increased the enormity or added to the injurious consequences of the abuse or neglect.*

N.C. Gen. Stat. § 7B-901(c)(1) (emphasis added). This Court has held that a finding under N.C. Gen. Stat. § 7B-901(c)(1)(f) requires evidence showing "something in addition to the facts that rise to the initial adjudication of abuse and/or neglect." *In re L.N.H*, 382 N.C. at 548, 879 S.E.2d at 146. If the findings in the disposition are limited to those that "fall[] into the same realm of which [the child] was adjudicated" then "the finding is not an 'other' act increasing the enormity or adding to the injurious consequences of the abuse or neglect . . . ." *In re N.R.R.N.*, 297 N.C. App. 673, 694, 911 S.E.2d 510, 524 (2025). Our Supreme Court has held sufficient "other" acts include when parents "have consistently worked together to conceal what happened to [the child]. This conduct increases the enormity and adds to the consequences of the neglect of [a sibling] because there is no means by which this

Court can address what caused the death of [the child] and thereby [e]nsure the safety of [a sibling]." *In re A.W.*, 377 N.C. 238, 253, 856 S.E.2d 841, 853 (2021).

In the case *sub* judice, the trial court found both children to be neglected and found Paul to be abused based on the following substantive findings:

> 144. In addition to the findings above, the Court finds the following particularly significant in adjudicating [Paul] a neglected child:
>
> 1) The Respondent Parents were the only caretakers for the child when he sustained life-threatening injuries, yet they both claim not to have seen what happened. This shows a lack of proper care and supervision.
>
> 2) Both parents delayed seeking medical care for a child in obvious distress. This constitutes a lack of proper care and a failure to provide necessary medical care.
>
> 3) Both parents thwarted the DSS investigation and delayed the ability to make any sort of safety plan for the child. This constitutes creating or allowing the creation of an injurious living environment.
>
> 4) The retinal hemorrhage [Paul] sustained was a sentinel injury. It was also observed by both parents three to four days before December 29, 2023, when the major injury to [Paul]'s skull occurred. There is no credible evidence that either parent in fact sought medical care for the blood both saw in their infant child's eye. Had the child been seen by a doctor, additional examinations may have occurred upon the identification of the sentinel injury. Failing to seek medical care for this obvious injury and then fabricating information about having done so constitutes the failure to provide proper care and contributed to the overall injurious environment.
>
> 5) [Mother] reported ending her romantic relationship with [Father] after [Paul] was injured after she was unable to

get an answer about what happened. The Court finds this compelling circumstantial evidence that [Mother] believes [Father] knows what happened to [Paul] but refuses to tell. The fact that one or both parents knows what happened to this child and both parents are intentionally acting to conceal the truth constitutes the failure to provide appropriate care for both children and the creation of an injurious environment for both children.

6) [Paul] also met a medical diagnosis of neglect, pursuant to the testimony of Dr. Thomas.

145. In addition to the findings above, the Court finds the following particularly significant in adjudicating [Patrick] a neglected child:

1) When trying to prevent DSS from seeking custody of [Patrick], [Mother] caused him to be placed in the home of her great- Aunt, where a child had previously waived a gun around and where marijuana buds were observed in plain sight on a windowsill. This constituted allowing the child to be placed in an injurious environment.

2) [Patrick] lived in a home where his brother [Paul] was abused by adults who regularly lived in the home, the children's parents, who inflicted or allowed to be inflicted serious non-accidental injuries to [Paul]. The parents were the children's only caregivers, but both claim not to know what caused the injuries. Clearly the parents were not providing appropriate supervision to either child.

The trial court's adjudication of the children primarily involved the infliction of Paul's injury, failure of the parents to explain Paul's injury, parents choosing to place Patrick in an injurious environment with Artesia and parents' delay in seeking medical care for Paul. Separate and apart from its findings supporting its conclusion that the children were neglected and Paul was abused, the trial court made a

multitude of findings concerning parents' ongoing efforts to thwart FCDSS and to manipulate the legal system during disposition and concluded reunification efforts should cease because:

159. Police reports, mental health reports, and the Court's own observations of [Mother] on the stand during both the Adjudication and Disposition hearings show a pattern of volatility, conflict, and aggression for both parents which has persisted for months. This therefore represents the ongoing state of things for these two parents and the injurious environment the children were living in before their removal.

159. The purpose of the services ordered at Disposition are to remediate or correct the behaviors and conditions that contributed to the children's removal from the parents' care and subsequent adjudication.

160. The Court must have some basis to believe parents will be forthcoming and honest in mental health evaluations, assessments, and in treatment if those tools are to be effective.

161. Given their pervasive deception, the Court has absolutely no faith that the Respondents will be forthcoming and honest so that a valid Parenting Capacity Assessment could be obtained or that the purposes of a reunification case plan will be served in working with these individuals.

162. The egregious nature of the parents' conduct and their actions detailed above have added to the enormity of the injurious consequences of the abuse and neglect to both [Paul] and [Patrick] such that the Court finds aggravating circumstances exist pursuant to NCGS § 7B-901 (c)(1)(f).

163. Reunification efforts shall not be required with either parent.

As in *In re A.W.*, the trial court reasoned that parents' ongoing collusion to conceal what happened to Paul and inability to provide veracity to FCDSS, the trial court, or medical personnel subverts the trial court's ability to ensure the safety of the children. The ongoing collusion and dishonesty are clearly "other" acts separate and apart from the initial injury to Paul and injurious environments for both boys, from which the trial court adjudicated the children abused and or neglected. Because the trial court identified "other" acts consistent with the statutory requirements of N.C. Gen. Stat. § 7B-901(c)(1)(f) and its conclusion was clearly supported by reason and factual findings, the trial court did not abuse its discretion in relieving FCDSS of reunification efforts at disposition.

### III.  Conclusion

After careful review of the record, we hold Mother and Father's argument on appeal is without merit. The trial court complied with the statutory criteria in N.C. Gen. Stat. § 7B-901(c)(1)(f) and did not abuse its discretion when relieving FCDSS of reunification efforts with the parents at disposition. Therefore, we affirm both the trial court's adjudication and disposition orders.

AFFIRMED.

Judges ZACHARY and HAMPSON concur.

Report per Rule 30(e).